HARLEY M. BROYLES (#011640)
EARTHJUSTICE
850 Richards Street, Suite 400
Honolulu, Hawai'i 96813
Tel: (808) 599-2436
Email: hbroyles@earthjustice.org


BARCLAY T. SAMFORD
(*pro hac vice* pending)
EARTHJUSTICE
633 17th Street, Suite 1600
Denver, CO 80202
Tel: (303) 623-9466
Email: csamford@earthjustice.org

ELIZABETH B. FORSYTH
(*pro hac vice* pending)
KRISTEN L. BOYLES
(*pro hac vice* pending)
EARTHJUSTICE
810 3rd Ave #610
Seattle, WA 98104
Tel: (206) 343-7340
Email: eforsyth@earthjustice.org
         kboyles@earthjustice.org

*Attorneys for Plaintiffs*[1]

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF HAWAI'I

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY; CONSERVATION COUNCIL FOR HAWAI'I; DEFENDERS OF WILDLIFE; NATIONAL PARKS CONSERVATION ASSOCIATION; SIERRA CLUB; WILDEARTH GUARDIANS; and SAVE THE MANATEE CLUB, <br><br>    Plaintiffs, <br><br>        v. <br><br> DOUGLAS BURGUM, U.S. SECRETARY OF THE INTERIOR; and U.S. FISH AND WILDLIFE SERVICE, <br><br>    Defendants. | ) CIVIL NO. CV-26-405 <br> ) <br> ) PLAINTIFFS' COMPLAINT FOR <br> ) DECLARATORY AND <br> ) INJUNCTIVE RELIEF <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

---

[1] Pursuant to LR 10.2(b) additional Counsel and Plaintiffs on signature page.

## INTRODUCTION

1.     Plaintiffs Center for Biological Diversity, Conservation Council for Hawai'i, Defenders of Wildlife, National Parks Conservation Association, Sierra Club, WildEarth Guardians, and Save the Manatee Club (collectively, "Plaintiffs") file this Complaint against United States Secretary of the Interior Douglas Burgum and the U.S. Fish and Wildlife Service ("the Service") (collectively, "Defendants") to challenge the Service's promulgation of the "Critical Habitat Exclusion Rule"— a new rule that unlawfully provides industry special interests with an effective veto over important agency decisions to protect essential habitat for imperiled species of wildlife under section 4(b)(2) of the Endangered Species Act ("ESA" or "Act"), 16 U.S.C. § 1533(b)(2). *See* Endangered and Threatened Wildlife and Plants; Regulations for Designating Critical Habitat, 91 Fed. Reg. 45662 (July 21, 2026) (codified at 50 C.F.R. § 17.90).

2.     Habitat destruction is a major, and often determinative, factor in the decline of many species protected as threatened or endangered under the ESA. To address this threat, the ESA provides for designation of critical habitat as a crucial component of the ESA's suite of species protections. Such designations identify habitat that is essential for the survival and recovery of our nation's most imperiled species, leading to distinct protections for this habitat under the ESA's statutory and regulatory scheme.

3.      Fundamentally, the ESA requires the Service to designate critical habitat based on the "best scientific data available," "to the maximum extent prudent and determinable" concurrently with listing a species as endangered or threatened. When doing so, the ESA also requires the Service to "tak[e] into consideration the economic impact, the impact on national security, and any other relevant impact, of specifying any particular area as critical habitat." Subsequently, the Service "*may* exclude any area from critical habitat if [the Service] determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat." But nothing in the Act requires the Service to exercise this discretion, and the Service is vested with significant discretion to find that the conservation benefits of a critical habitat designation trump any economic concerns.

4.      Contrary to the plain language and intent of the ESA, the Critical Habitat Exclusion Rule wrests this discretion away from the Service by empowering permittees, lessees, contractors, private landowners, local governments, and other economic interests to force the Service to exclude areas from critical habitat based on unverified and potentially biased data. The rule now *requires* the Service to consider excluding an area if a party provides "credible information" regarding a relevant impact of critical habitat designation, 50 C.F.R. § 17.90(c)(2)(i), which the Service defines as "a reasonably reliable indication

2

regarding the existence of a meaningful economic or other relevant impact"—a vague and extraordinarily low bar for forcing the Service to conduct an exclusion analysis. 91 Fed. Reg. at 45670. Once this analysis is triggered, the rule next *requires* the Service to "give weight" to the information provided by the party proposing exclusion, unless the Service can affirmatively rebut the information provided. 50 C.F.R. § 17.90(d)(1). Finally, and based on an analysis already unduly influenced by the preferences of entities seeking relief from critical habitat protections, the rule *requires* the Service to exclude the proposed area from critical habitat designation if the benefits of excluding a particular area from critical habitat outweigh the benefits of specifying that area as part of the critical habitat. 50 C.F.R. § 17.90(e). Ultimately, the new regulation replaces the Service's statutorily provided discretion with binding requirements to exclude areas essential to a species' survival and recovery at the request of special interests motivated by economic gains.

5.     The new rule also makes it easier to prevent designation of critical habitat located on federal lands, where designation confers the greatest conservation benefits because of the ESA's prohibition on destruction or adverse modification of critical habitat by federal agencies.

6.     Although this new rule is likely to have significant impacts on threatened and endangered species by reducing their designated critical habitats,

Defendants failed to undertake any analysis of the Critical Habitat Exclusion Rule's environmental impact, contrary to the requirements of the National Environmental Policy Act.

7.    Plaintiffs therefore seek an order (1) declaring the Critical Habitat Exclusion Rule invalid, (2) vacating the Critical Habitat Exclusion Rule and restoring the regulations and policies governing ESA Section 4(b)(2) critical habitat exclusions that were in effect prior to promulgation of the Critical Habitat Exclusion Rule, and (3) enjoining the Service from applying or otherwise relying on the Critical Habitat Exclusion Rule.

**JURISDICTION AND VENUE**

8.    Plaintiffs bring this action under the APA, 5 U.S.C. §§ 701–706, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4347, which waive the Defendants' sovereign immunity. This Court has jurisdiction over this action by virtue of 28 U.S.C. § 1331 (actions under the laws of the United States), 28 U.S.C. §§ 2201–2202 (power to issue declaratory judgments in cases of actual controversy).

9.    Venue is properly vested in this judicial district under 28 U.S.C. § 1391(e) because this is a civil action in which officers or employees of the United States or an agency thereof are acting in their official capacities or under color of legal authority, Plaintiff Conservation Council for Hawaiʻi resides in this

4

district, other Plaintiffs have members and offices in this district, and many of the consequences of the Defendants' violations of the laws giving rise to the claims articulated herein occurred or will occur in this district.

10.    The challenged agency action is final and subject to this Court's review under the APA, 5 U.S.C. §§ 701–706.

## PARTIES

### Plaintiffs

11.    Plaintiff Center for Biological Diversity ("the Center") is a nonprofit conservation organization dedicated to the protection of native species and their habitats through science, policy, and the effective implementation of environmental laws such as the ESA. The Center is incorporated in California and headquartered in Tucson, Arizona, with field offices throughout the United States and Mexico, including in Honolulu, Hawai'i. The Center has more than 1.8 million members and online activists dedicated to the protection and restoration of endangered species and native ecosystems. As a result of the Center's work, over 700 species and nearly half a billion acres of critical habitat have been protected under the ESA.

12.    The Center has a long history of environmental advocacy with a particular focus on listing, uplisting, and designation of critical habitat for imperiled species across the United States. Among the many species the Center has

5

successfully fought to protect are the polar bear (*Ursus maritimus*), Gunnison sage-grouse (*Centrocercus minimus*), and Canada lynx (*Lynx canadensis*). For each of these species, critical habitat opponents sought exclusions in order to continue developing and exploiting resources located on federal lands, and to preserve the opportunity to do so in the future. However, the Service rejected industry's speculative claims of remote and uncertain economic harms.

13.	In the case of the polar bear, the Center wrote the 2005 scientific petition calling for the bear's protection and filed suit twice to force the Service to act on that petition, securing the species' listing in 2008. *See Ctr. for Biological Diversity v. Kempthorne*, No. C 08-1339 CW, 2008 WL 1902703, at *3 (N.D. Cal. Apr. 28, 2008).

14.	When the Service designated polar bear critical habitat in 2010, the agency declined to exclude federal lands "in which oil and gas exploration, development, production, and transportation activities are occurring or are planned in the future." Endangered and Threatened Wildlife and Plants; Designation of Critical Habitat for the Polar Bear (Ursus maritimus) in the United States, 75 Fed. Reg. 76086, 76097 (Dec. 7, 2010). While critical habitat opponents predicted that designation would cost oil and gas producers billions of dollars, the Service rejected these estimates due to "uncertain[ty]." *See id.* at 76105, 76106. Ultimately, the Service rejected the fossil fuel industry's claims and determined that the

6

"economic impacts associated with the designation" were neither "significant" nor "disproportionate." *Id.* at 76127. The Center subsequently intervened in a legal challenge filed by oil and gas interests and helped to successfully defend the Service's economic analysis and decision not to exclude areas based on speculative claims of economic harms. *See Alaska Oil & Gas Ass'n v. Jewell*, 815 F.3d 544 (9th Cir. 2016). The Critical Habitat Exclusion Rule makes it reasonably probable that the Service would credit such claims in future critical habitat designation decisions, thereby harming the Center's interest in protecting and recovering the polar bear.

15.    In the case of the Gunnison sage-grouse, the Service likewise declined to exclude areas based on speculative future oil and gas development. *See* Endangered and Threatened Wildlife and Plants; Designation of Critical Habitat for Gunnison Sage-Grouse, 79 Fed. Reg. 69312, 69324, 69346 (Nov. 20, 2014). The Center has fought to protect the Gunnison sage-grouse through multiple lawsuits forcing the Service to take action required by the ESA, including making a listing determination for the species and developing a recovery plan for the species once listed. The Critical Habitat Exclusion Rule makes it reasonably probable that the Service would credit speculative claims in future critical habitat designation decisions, thereby harming the Center's interest in protecting and recovering the Gunnison sage-grouse.

7

16.     The Canada lynx evolved to live and hunt in deep snow and its thick fur made it a target for trapping through the 1970s. The Center has fought to protect the lynx and its critical habitat, including through litigation to prevent the setting of traps that incidentally kill lynx within their core habitat range.

17.     The snowmobile industry has repeatedly sought to nullify critical habitat designation for the Canada lynx to allow more snowmobile traffic in the lynx's essential habitat. In 2010, the Center intervened in an industry lawsuit to defend the Service's decision not to exclude from critical habitat designation lands used by snowmobilers in Washington State. *See Wyo. State Snowmobile Ass'n v. U.S. Fish & Wildlife Serv.,* 741 F. Supp. 2d 1245 (D. Wyo. 2010). In a 2014 revision expanding the lynx's critical habitat, the Service again rejected unfounded claims that designation would "result in disproportionate economic impacts to snowmobiling interests," and declined to exclude areas used for snowmobiling. Endangered and Threatened Wildlife and Plants; Revised Designation of Critical Habitat for the Contiguous United States Distinct Population Segment of the Canada Lynx and Revised Distinct Population Segment Boundary, 79 Fed. Reg. 54782, 54829–830 (Sept. 12, 2014). The Critical Habitat Exclusion Rule makes it reasonably probable that the Service would credit such claims in future critical habitat designation decisions, thereby harming the Center's interest in protecting and recovering the Canada lynx.

18.     The Center regularly sues the Service to ensure timely compliance with ESA Section 4, including critical habitat designations. The Center brought a successful lawsuit that concluded with entry of a court-approved stipulation directing the Service to designate critical habitat for fourteen endangered species found only on Hawaiʻi Island (12 plants, 1 anchialine pool shrimp, and 1 picture-wing fly), including the koʻokoʻolau (*Bidens hillebrandiana ssp. Hillebrandiana*), hāhā (*Cyanea marksii*), ʻaku (*Cyanea tritomantha*), and loʻulu (*Pritchardia munroi*). *See Ctr. for Biological Diversity v. Bernhardt et al.*, No. 1:19-cv-588 HG-KJM (D. Haw. filed Oct. 28, 2019) (stipulation for dismissal with prejudice); Endangered and Threatened Wildlife and Plants; Designation of Critical Habitat for 12 Species on Hawaiʻi Island, 89 Fed. Reg. 17902 (Mar. 12, 2024) (designating critical habitat in response to the Center's lawsuit).

19.     The Center also challenged the Service's failure to designate critical habitat for the green sea turtle (*Chelonia mydas*), ultimately resulting in the Service proposing to designate approximately 8,870 acres of critical habitat in the States of Florida and Hawaiʻi; the territories of the U.S. Virgin Islands, American Samoa, and Guam; the commonwealths of Puerto Rico and the Northern Mariana Islands, and two Service-managed areas (Midway Islands and Palmyra Atoll) in 2023. *Ctr. for Biological Diversity v. Bernhardt et al.*, Civ. No. 1:20-cv-36 (D. Haw. filed Jan. 8, 2020); Endangered and Threatened Wildlife and Plants; Designation of

9

Critical Habitat for Green Sea Turtle, 88 Fed. Reg. 46376 (July 19, 2023). During the administrative process on the proposed designation, a municipal commentor claimed that the proposal will "creat[e] budgeting restraints" for municipalities, and that "[i]f this proposed rule is approved as is, economic impacts would also occur to coastal communities that rely solely on a tourism economy if beach renourishment is restricted [by the critical habitat designations]." The Southern Shrimp Alliance also commented on the National Marine Fisheries Service's proposed critical habitat that areas "overlap with valuable traditional shrimp fishing grounds" and that the Gulf shrimp fishery could be "significantly adversely impacted" by the critical habitat designation. The comment period for the proposed critical habitat designation has closed, and the Center has no ability to provide a rebuttal to these speculative economic claims. Moreover, the Service has posted on the public docket only 64 of the 22,553 comments received on the proposed critical habitat designation, precluding the Center from even reviewing the vast majority of public comments that have been submitted to determine whether they make additional economic claims. Given these circumstances, it is reasonably probable that the Service will apply the Critical Habitat Exclusion Rule to remove proposed areas of critical habitat in response to commenters raising economic concerns when it issues the final critical habitat designation.

20.     The Center also petitioned the Service to protect the ʻiʻiwi (*Vestiaria coccinea*) under the Endangered Species Act and subsequently challenged the Service's failure to designate critical habitat for the species. *Ctr. for Biological Diversity v. de la Vega*, No. 1:21-cv-00122-JMS-RT (D. Haw. filed Mar. 3, 2021). The ʻiʻiwi bird is an icon of surviving native forests of Hawaiʻi, recognized by its bright scarlet and black plumage and long curved beak, and has declined in recent decades due in part to habitat destruction. The Center's advocacy ultimately resulted in the Service proposing the designation of approximately 275,647 acres of critical habitat for the ʻiʻiwi on the islands of Kauaʻi, Maui, and Hawaiʻi in 2022. Endangered and Threatened Wildlife and Plants; Designation of Critical Habitat for ʻIʻiwi, 87 Fed. Reg. 79942 (Dec. 28, 2022). During the public comment period, Pacific Legal Foundation—a group that advocates "for the defense of private property rights"—requested the Service remove all private property from the proposed designated critical habitat on the basis that it "imposes large costs" to landowners. Hawaiʻi Cattlemen's Council, Inc also submitted comments asking the Service to exclude ranchlands from critical habitat designation to prevent an "undue negative impact on the Hawaiʻi cattle industry." The comment period for the proposed critical habitat designation has closed, and the Center has no ability to provide a rebuttal to the economic claims of Pacific Legal Foundation or Hawaiʻi Cattlemen's Council, Inc. It is reasonably probable that the Service will apply the

11

Critical Habitat Exclusion Rule to remove proposed areas of critical habitat in response to commenters raising economic concerns when it issues the final critical habitat designation.

21.    The Center also petitioned the Service to protect the monarch butterfly (*Danaus plexippus*) under the Endangered Species Act, ultimately resulting in the Service proposing the designation of approximately 4,395 acres of critical habitat for the species in Alameda, Marin, Monterey, San Luis Obispo, Santa Barbara, Santa Cruz, and Ventura Counties, California. Endangered and Threatened Wildlife and Plants; Threatened Species Status With Section 4(d) Rule for Monarch Butterfly and Designation of Critical Habitat, 89 Fed. Reg. 100662 (Dec. 12, 2024). The California Four Wheel Drive Association commented on the proposed critical habitat designation, stating that it would "detrimentally impact local economies that depend on outdoor recreation," an industry it claims is "worth more than $10 billion." The comment period for the proposed critical habitat designation has closed, and the Center has no ability to provide a rebuttal to the economic claims of California Four Wheel Drive Association. Moreover, the Service has posted on the public docket only 81,230 of the 186,672 comments it has received on the proposed critical habitat designation, precluding the Center from even reviewing the vast majority of public comments that have been submitted to determine whether they make additional economic claims. Given

12

these circumstances, it is reasonably probable that the Service will apply the Critical Habitat Exclusion Rule to remove proposed areas of critical habitat in response to commenters raising economic concerns when it issues the final critical habitat designation.

22.    The Center also filed suit to enforce the Service's duty to designate critical habitat for the endangered Texas hornshell (*Popenaias popeii*). *See Ctr. for Biological Diversity v. Bernhardt et al.,* No. 1:20-cv-00573-EGS (D.D.C. filed Feb. 27, 2020). The Texas hornshell, a freshwater mussel historically found throughout the Rio Grande River in New Mexico, Texas, and Mexico, occurs in the United States in five isolated populations located in part on or near federal lands. The primary threats to the species are degraded water quality, increased sedimentation, loss of flowing water, and barriers to fish movement. The Texas hornshell's riparian habitat is threatened by oil and gas development, cattle grazing, and other polluting industries located along the rivers where the species is found. In 2021, the Service proposed 463.6 river miles of critical habitat for the Texas hornshell in Eddy County, New Mexico, and in Culberson, Brewster, Terrell, Val Verde, Kinney, Maverick, and Webb Counties, Texas, in response to the Center's lawsuit. *See* Endangered and Threatened Wildlife and Plants; Designating Texas Hornshell Critical Habitat, 86 Fed. Reg. 30888 (June 10, 2021). Industry commenters opposed designation of certain areas of critical habitat, telling

the Service that critical habitat designation would have a "significant effect on oil and natural gas production" and put ranchers "out of business." The comment period for the proposed listing has closed, and the Center has no ability to provide a rebuttal to the economic claims of industry commenters. Moreover, the Service has posted on the public docket only 29 of the 1,044 comments it has received on the proposed critical habitat designation, precluding the Center from even reviewing the vast majority of public comments that have been submitted to determine whether they make additional economic claims. Given these circumstances, it is reasonably probable that the Service will apply the Critical Habitat Exclusion Rule to remove the areas of critical habitat where these commenters have raised economic concerns when issuing the final critical habitat designation.

23.     Participating in the proposed critical habitat designations is part of the core business activities of the Center. Under the Critical Habitat Exclusion Rule, the Center will be prevented from participating effectively in the designation process, including specifically by being unable to provide rebuttal to the claims of economic burdens submitted by industry opponents to critical habitat designation, thereby injuring the Center's ability to engage in such core activities.

24.     The Center and its members rely on the designation of critical habitat to preserve and aid in the recovery of endangered plants and animals, including but

14

not limited to the polar bear, Canada lynx, Gunnison sage-grouse, Hawaiʻi Island species, the green sea turtle, the ʻiʻiwi, the monarch butterfly, and Texas hornshell. The Center and its members derive substantial scientific, educational, recreational, commercial, cultural, spiritual, and aesthetic benefits from studying, observing, photographing, and enjoying these and other imperiled species in their native ecosystems, and have specific intentions to continue to do so on an ongoing basis into the future.

25. For example, the Center has a native Hawaiian member raised on the North Shore of Kauaʻi near Limuhuli, where she grew up surrounded by the native valley forest at the foot of the Na Pali cliffs. She was raised with an understanding of the ʻiʻiwi as a symbol of the living native forest and of her ancestral connection to the mountain ecosystems above her community. As a child and into adulthood, she regularly hiked the trails above Limuhuli into the native forest and heard the distinctive call of the ʻiʻiwi in the ʻōhiʻa canopy. She has observed ʻiʻiwi in the wild on Kauaʻi on multiple occasions and these encounters hold deep personal and cultural significance to her. She continues to visit and hike in ʻiʻiwi habitat on Kauaʻi and intends to do so on an ongoing basis in the future. She is gravely concerned that without robust critical habitat protections for the ʻiʻiwi on Kauaʻi, particularly in the high-elevation forests that serve as the species' last refuge from avian malaria, the ʻiʻiwi will disappear from the landscape her family has called

15

home for generations. Her cultural, recreational, and aesthetic interests in the ʻiʻiwi will be concretely and irreparably harmed if the Critical Habitat Exclusion Rule results in the reduction or elimination of critical habitat that the best available science identifies as essential to the species' survival and recovery, including in response to the economic claims of Pacific Legal Foundation and Hawaiʻi Cattlemen's Council.

26. This same member also has a profound and lifelong connection to the honu, or green sea turtle. In Native Hawaiian tradition, the honu is regarded as an ʻaumakua, an ancestral guardian spirit, and she was raised with a deep reverence for the green sea turtle as a living embodiment of that ancestral presence. Growing up on the North Shore of Kauaʻi, she regularly encountered green sea turtles on the beaches and in the nearshore waters of her community, and these encounters were woven into her daily experience of the coast and her understanding of her family's relationship to the ocean. She has also spent significant time with her ʻohana on the North Shore of Oʻahu, where green sea turtles are a consistent presence on the reefs and beaches she visits for surfing, swimming, and other ocean recreation. She intends to continue spending time in these coastal waters and on these beaches and to observe and experience green sea turtles on an ongoing basis into the future. Her cultural, spiritual, recreational, and aesthetic interests in the green sea turtle and its continued presence in Hawaiian waters will be concretely harmed if the Critical

16

Habitat Exclusion Rule results in the reduction or elimination of critical habitat that the best available science identifies as essential to the survival and recovery of the Hawaiian population of the green sea turtle.

27. Plaintiff Conservation Council for Hawai'i ("CCH") is a non-profit citizens' organization based in Hawai'i with approximately 4,000 members in Hawai'i and throughout the United States mainland and foreign countries. CCH is the Hawai'i affiliate of the National Wildlife Federation, a non-profit membership organization with over 6 million members and supporters nationwide. CCH's mission is to protect native Hawaiian species, including threatened and endangered species, and to restore native Hawaiian ecosystems.

28. For over 70 years, CCH's work has been foundational to conservation efforts in Hawai'i. The protection of Hawai'i's endangered and threatened plants and animals, and of the habitat upon which they depend, is of particular concern to CCH. In furtherance of these goals, CCH was the lead plaintiff in *Conservation Council for Hawai'i v. Lujan*, No. 89-953 ACK (D. Haw. filed Dec. 8, 1989), resulting in a settlement pursuant to which the Service listed 187 taxa of Hawaiian plants; *Conservation Council for Hawai'i et al. v. Babbitt*, 2 F. Supp. 2d 1280 (D. Haw. 1998), in which the court found arbitrary and capricious the Service's refusal to designate critical habitat for 245 taxa of endangered and threatened plants; and *Conservation Council for Hawai'i v. Babbitt*, Civ. No. 99-00283 HG (D. Haw.

17

filed Apr. 20, 1999), which yielded a judgment securing listing and critical habitat designation for ten plant taxa from Maui Nui.

29.    When designating critical habitat for the species at issue in these cases under court order, the Service repeatedly rejected claims of economic harm made by critical habitat opponents. *See, e.g.,* Endangered and Threatened Wildlife and Plants; Final Designation and Nondesignation of Critical Habitat for 46 Plant Species From the Island of Hawaii, HI, 68 Fed. Reg. 39624, 39640–41 (July 2, 2003) (rejecting allegedly "substantial costs associated with conservation management actions" on lands designated as critical habitat for imperiled Hawaiian plants as "not reasonably foreseeable"); *id.* at 39643 (finding that "the methodology used by the commenter to derive the estimated economic impact of $390 million [from designation] is not consistent with the methodology presented in [the Service's draft economic analysis]"). Similarly, when later revising those critical habitat designations, the Service again rejected claims of harm as unsubstantiated. *See, e.g.,* Endangered and Threatened Wildlife and Plants; Designation and Nondesignation of Critical Habitat on Molokai, Lanai, Maui, and Kahoolawe for 135 Species, 81 Fed. Reg. 17790, 17832 (Mar. 30, 2016) (rejecting alleged harm to ranching interests "due to the significant uncertainty surrounding the likelihood and potential magnitude of any such potential effects."). The Critical Habitat Exclusion Rule makes it reasonably probable that the Service would credit

such claims in future critical habitat designation decisions, thereby harming CCH's interest in protecting and recovering imperiled species.

30.   CCH also has a particular interest in the green sea turtle. CCH has previously filed suit to protect the green sea turtle, including from harm from artificial beach lighting and from commercial fishing in the Pacific Islands Heritage Monument. CCH and its members have also advocated for a statewide ban on lay gillnets, which can drown green sea turtles, and for establishment of marine protected areas which benefit green sea turtles.

31.   CCH's members rely on the designation of critical habitat to aid in the recovery of endangered and threatened Hawaiian plants and animals, including, but not limited to, green sea turtle, the 'i'iwi, and the hundreds of imperiled plant taxa across the State of Hawai'i for which CCH's advocacy secured critical habitat protection. CCH's members hike, live, and work in areas where these plant and animal species occur, and they derive substantial scientific, educational, recreational, commercial, cultural, spiritual, and aesthetic benefits from studying, observing, photographing, and enjoying these and other imperiled species in the wild, and from advocating for these species' protection under the law.

32.   Plaintiff Defenders of Wildlife ("Defenders") is a non-profit conservation organization dedicated to its mission of protecting all native animals and plants in their natural communities within the United States. Defenders is

19

incorporated and headquartered in Washington D.C., and has approximately

235,000 members located across the United States and its territories, including

approximately 1,440 in the State of Hawai'i. Defenders has developed programs

for combating species extinction, the loss of biological diversity, and habitat

alteration and destruction. Defenders has long been involved in seeking to promote

the protection and recovery of threatened and endangered species using the ESA.

33.     Defenders regularly provides comments on critical habitat designation

proposals to ensure that the most biologically critical areas for imperiled species'

survival and recovery are included in the final designations. Defenders also

engages in litigation to ensure that the Service complies with the law and to defend

critical habitat designations from challenges by industry opponents and others.

Among the many species Defenders has fought to protect are the West Indian

manatee (*Trichechus manatus*), North American wolverine (*Gulo gulo luscus*), and

northern spotted owl (*Strix occidentalis caurina*). In past rounds of advocating for

designating critical habitat for each of these species, Defenders advocated for

protective designations—including areas on federal lands—and for minimizing

exclusions based on speculative economic harm.

34.     Defenders is currently tracking and plans to comment on the

forthcoming critical habitat designation for the North American wolverine. In

2023, the Service made a "not determinable" finding for designating critical habitat

20

for this species based on a "lack of economic information." The Service committed to revisiting the critical habitat designation once that information is available. Defenders expects that, when the rule is proposed, Defenders will be obliged to rebut claims of economic impacts, which the Service now, under the Critical Habitat Exclusion Rule, has the affirmative duty to take at face value unless information is submitted to rebut speculative economic impacts. Defenders' members have a strong aesthetic and recreational interest in observing, photographing, and enjoying wolverines and other imperiled species in the wild. Defenders' members visit areas that may be excluded from critical habitat for the wolverine based on economic considerations privileged by the rule. For example, one of Defenders' members has spent their entire life in the west, spending significant time in alpine habitat in Colorado, Montana, Wyoming, and Idaho where she looks for wolverine and has successfully seen the elusive species on two occasions. This member has plans to visit multiple areas that serve as wolverine habitat over the remainder of this summer, including significant time in alpine areas in Colorado while conducting biological survey work and during a backpacking and hiking trip near West Yellowstone. She also has plans to return to those same areas in Colorado for additional work in the fall and has plans to ski in Colorado within wolverine habitat this winter. This member's, and other Defenders' members', interests will be harmed if exclusions are made from the

21

wolverine's final critical habitat designation based on economic concerns as the deprivation of the essential protections provided by the designation will make it less likely that they will be able to view the wolverine in the wild. Defenders will continue to advocate for the protection of the wolverine and its members will continue to visit its habitats and the ecosystems that allow for these species' survival for the foreseeable future.

35.    Defenders is also currently tracking proposed amendments to critical habitat for the Florida manatee issued in 2024. Defenders, along with Save the Manatee Club and the Center, commented on that proposal to support the designation of critical habitat for the subspecies, which included significant areas that overlap with areas with economic interest along the coast of Florida as well as public lands with a significant number of federal permittees. The Service's proposed designation has been pending for nearly two years now and Defenders anticipates that the Service may reopen comments under the new rule to solicit additional economic information and that Defenders would need to rebut economic information submitted by industry groups, permit holders, and others.

36.    Defenders' members visit and rely on the protection of areas that may be excluded from critical habitat under the Service's rule. For example, one member owns and operates an in-water adventure company that offers manatee swim tours, primarily in and around Crystal River National Wildlife Refuge, the

22

manatee capital of the world. He has offered those tours daily for over a decade and seeks to continue to do so into the foreseeable future. Manatee tours make up approximately 50% of his business' revenue and are a major draw to the area for tourism, as the refuge is the only place in the world where one can lawfully swim with manatees. This member's economic interests—as well as his aesthetic and recreational interest in the Florida manatee—rely on the preservation of the Crystal River area as quality habitat for manatee and would be harmed by the exclusion of areas within the national wildlife refuge based on economic claims from other groups that hold permits within the refuge. His and other Defenders members' interests would also be harmed by the exclusion of other habitat relied on by this migratory species based on other economic information from industry groups. Defenders' members in Florida also regularly visit and recreate in areas proposed as critical habitat in the Silver Springs/Silver River area—expected to be critically important in the future as warm water refuges for manatees, as artificial warm water areas from industry are phased out—and will continue to do so. Defenders will continue to advocate for the inclusion of these important areas as protected critical habitat for the Florida manatee.

37. Defenders is also tracking an upcoming revision to the northern spotted owl's critical habitat designation. The Service has already begun a rulemaking to consider excluding areas from the owl's current critical habitat

23

pursuant to Section 4(b)(2). Defenders and its members are concerned that, especially following the passage of the Critical Habitat Exclusion Rule, the Service will seek to exclude vast areas from the owl's current critical habitat designation based on alleged economic impacts, as it did in January 2021. At that time, amongst other exclusions, the Service excluded over 1.3 million acres of federal land managed by BLM in Oregon from the owl's critical habitat designation, based on alleged economic impacts on timber revenue from these lands. While FWS later withdrew that decision, such a sweeping rescission would devastate the owl's survival and recovery. Defenders' members regularly visit and rely on the protection of areas that may be excluded from critical habitat under the Service's rule, such as these BLM lands. For instance, one Defender member recreates on an ongoing basis in BLM lands near where he lives in southern Oregon. While hiking, backpacking, camping, and rafting along those lands, he is looking and listening for northern spotted owls. However, if these lands are excluded from the owl's critical habitat designation, they will lose essential protections and are more likely to be cut for timber harvest. Excluding these lands from the designation based on alleged economic impacts will make it less like that this member and others will have the opportunity to hear or view northern spotted owls in the wild and more likely that these landscapes will be marred by clear cuts, harming their aesthetic and recreational interests.

24

38.    Plaintiff National Parks Conservation Association ("NPCA") is a nonprofit environmental group founded in 1919 as a leading voice for America's national parks. NPCA is headquartered in Washington, D.C., and has more than two dozen programmatic locations in 11 regions, including the Pacific Regional Field Office, which focuses on protecting national parks and their resources in the Pacific region, including Hawaii. NPCA and its more than 1.9 million members and supporters work together to protect and preserve our nation's most iconic and inspirational places for future generations. Over 600 ESA-listed species are found in the national parks system, including in Haleakalā National Park and Hawai'i Volcanoes National Park, both of which are located in Hawai'i.

39.    In 2019, NPCA formally established its first national program dedicated exclusively to the conservation of wildlife in national parks. The program engages NPCA's members and allies to obtain long-term protections for park wildlife, and to support the recovery of threatened and endangered species in national park landscapes. To reach these goals, NPCA drafts comments on critical habitat proposals, federal and state wildlife management projects, and wildlife regulations.

40.    NPCA's members rely on critical habitat protections to aid in the recovery of imperiled species that live on and around national park system lands, such as the monarch butterfly with habitat in Zion and Great Smoky Mountains

25

National Parks, the California spotted owl with habitat in Lassen Volcanic National Park and Devil's Postpile National Monument, and the northwestern pond turtle with habitat in Yosemite National Park. NPCA's members derive scientific, educational, recreational, commercial, cultural, spiritual, and aesthetic benefits from observing, studying, conserving, and photographing imperiled species like the monarch butterfly, California spotted owl, and northwestern pond turtle.

41.    For example, NPCA has a member who has spent his career working on parks and other protected areas on public lands. He is an avid birder who frequently looks for spotted owls, including the California spotted owl, and he has plans to try to view California spotted owls at the Devil's Postpile National Monument in California this year. The Service has proposed to list the Sierra Nevada distinct population segment of California spotted owl as threatened under the ESA, and he is concerned that the Critical Habitat Exclusion Rule will ultimately result in fewer protections for the California spotted owl, thereby harming his interest in viewing them.

42.    NPCA also has a member who regularly visits the Great Smoky Mountains National Park. He plans to visit monarch butterfly habitat again this year with his newborn daughter. Reduction in critical habitat protections for the monarch butterfly due to the Critical Habitat Exclusion Rule would harm the

monarch and reduce his opportunity to view them, thereby harming his interest in the monarch.

43.  Plaintiff Sierra Club is a national nonprofit organization with 67 chapters and about 595,000 members dedicated to exploring, enjoying, and protecting the wild places of the earth; to practicing and promoting the responsible use of the earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives. The Hawai'i Chapter of the Sierra Club has over 4,100 members.

44.  Among other advocacy actions to protect imperiled species, Sierra Club successfully sued the Service for arbitrarily failing to designate critical habitat for 245 taxa of endangered and threatened Hawaiian plants. *See Conservation Council for Hawai'i, et al. v. Babbitt*, 2 F. Supp. 2d 1280 (D. Haw. 1998). As a result of the Sierra Club's advocacy, the Service designated critical habitat for hundreds of endangered and threatened plant taxa, all of which are endemic to the Hawaiian Islands. As described above, the Service repeatedly rejected specious claims of economic harm made by critical habitat opponents during the designation process for protected Hawaiian plant species.

45.  Sierra Club and its members regularly advocate for imperiled species and for the conservation and protection of the ecosystems upon which these

27

species rely, and they will continue to do so on an ongoing basis in the future. Sierra Club's members rely on the protection that critical habitat provides to aid in the recovery of imperiled species that members frequently observe, study, and photograph for scientific, educational, recreational, commercial, cultural, spiritual, and aesthetic purposes.

46. For example, one of Sierra Club's members who lives in Montana has an interest in the monarch butterfly and western bumble bee. She planted a pollinator garden with the goal of giving pollinators a place to land with four types of milkweed, coneflowers, echinacea, rosy pussy toes, and other native species that attract pollinators. When she first moved to her property she saw monarch butterflies, but they have grown increasingly rare. Every year for the last five years she has spent approximately $300 to $500 annually to replenish the pollinator plants to benefit monarch butterflies and the western bumble bee, in the hopes of attracting them so she can observe them, and she plans to continue her efforts to support these pollinators and attempt to view them as long as she is able to. She is aware of the pending critical habitat designation for monarch butterflies and believes that reduction in critical habitat protections for the monarch butterfly due to the Critical Habitat Exclusion Rule will harm the monarch and thereby harm her interest in viewing the monarch. She is also aware that in 2016, the Service made a finding that protecting the western bumble bees as threatened or endangered under

28

the ESA may be warranted. She is concerned that the Critical Habitat Exclusion Rule will reduce the habitat protections the western bumble bee would otherwise receive under the ESA, harming her interest in viewing this species as well.

47. Plaintiff WildEarth Guardians ("Guardians") is a non-profit membership organization with over 176,000 members and supporters with the shared mission of protecting threatened and endangered species and their habitats. Guardians is incorporated in New Mexico and headquartered in Santa Fe, New Mexico, with additional offices in Denver, CO, Portland, OR, Tucson, AZ, and Missoula, MT. Guardians uses science and environmental laws to protect and restore the wildlife, wild places, wild rivers, and health of the American West. In particular, Guardians advocates for the protection and restoration of endangered and threatened species and their habitats throughout the Western United States.

48. Among the many species Guardians has helped to protect is the New Mexico meadow jumping mouse. The New Mexico meadow jumping mouse lives in riparian grasslands that have been severely degraded throughout its historical range due to cattle grazing. In October 2008, Guardians filed an ESA petition to list the mouse as an endangered species, and, in 2011, Guardians entered a settlement agreement that successfully obtained listing for this species. Subsequently, Guardians was instrumental in ensuring that thousands of acres identified as critical to the mouse's survival and recovery were not excluded from

29

critical habitat designation due to specious claims of economic harm from ranching interests that use federal lands to graze cattle. In addition to submitting extensive comments on the mouse's biological needs, Guardians subsequently intervened in defense of litigation initiated by two cattlemen's associations challenging the Service's decision to designate grazing allotments as critical habitat. The District Court for the District of New Mexico upheld the Service's decision. *See N. New Mexico Stockman's Ass'n v. U.S. Fish & Wildlife Serv.,* 494 F. Supp. 3d 850 (D.N.M. 2020), *aff'd,* 30 F.4th 1210 (10th Cir. 2022). Despite this victory, the New Mexico meadow jumping mouse continues to face threats to its habitat from ranching interests.

49.    Guardians' members regularly visit, study, work, and recreate in areas where the New Mexico meadow jumping mouse lives, and they have specific intentions to continue to do so frequently and on an ongoing basis in the future. Guardians' members derive scientific, educational, recreational, commercial, spiritual, cultural, and aesthetic benefits from viewing, observing, photographing, studying, researching, and conserving this species in the wild.

50.    For example, a WildEarth Guardians member visits the Jemez Mountains, where at least ten populations of the New Mexico meadow jumping mouse are known to occur, multiple times each summer to camp, rock climb, and view wildlife species, and she plans to continue returning several times each year

30

in the future. She also visits Bosque del Apache National Wildlife Refuge annually to attempt to view wildlife such as the New Mexico meadow jumping mouse and plans to continue doing so. Her interest in the New Mexico meadow jumping mouse and its habitat will be harmed by reductions in New Mexico meadow jumping mouse critical habitat protections due to the Critical Habitat Exclusion Rule.

51.    Plaintiff Save the Manatee Club is a nonprofit 501(c)(3) membership organization dedicated to the conservation of manatees. The organization was founded in 1981 by singer and songwriter Jimmy Buffett and Governor of Florida Bob Graham. Save the Manatee Club is located in Longwood , Florida. The organization currently has about 40,000 active members and supporters.

52.    Save the Manatee Club, along with the Center, Wildlife Advocacy Project and Defenders, petitioned the Service in 2008 to revise critical habitat for the Florida manatee. The Service found that revisions to critical habitat were warranted in January 2010 but failed to act for more than 12 years. To remedy this delay, Save the Manatee Club, the Center, and Defenders of Wildlife filed suit against the Service in February 2022, ultimately resulting in the Service proposing to designate approximately 1,904,191 acres of critical habitat for the Florida manatee and 78,121 acres for the Antillean manatee subspecies in 2024. *See* Endangered and Threatened Wildlife and Plants; Critical Habitat Designations for

31

Florida Manatee and Antillean Manatee, 89 Fed. Reg. 78134 (Sept. 24, 2024).

Save the Manatee Club co-drafted comments on the proposed critical habitat

designation with Defenders and the Center. The Service has posted on the public

docket for this rulemaking only 38,040 of the 70,899 comments it has received on

the proposed critical habitat designation, precluding the Save the Manatee Club

from even reviewing the vast majority of public comments that have been

submitted to determine whether they make economic claims. Industry interests,

including real estate developers, marina developers, and certain members of the

watercraft construction industry have opposed protections for Florida manatees in

the past. It is reasonably probable that the Critical Habitat Exclusion Rule will lead

to reductions in critical habitat for manatees in Florida.

53.    Save the Manatee Club and its members and supporters rely on the

designation of critical habitat for manatees to preserve and aid in the recovery of

manatees. Save the Manatee Club and its members and supporters derive

substantial scientific, educational, recreational, commercial, cultural, spiritual, and

aesthetic benefits from studying, observing, photographing, aiding and enjoying

manatees, including their essential aquatic habitats and other imperiled species that

rely on manatee habitat in their native ecosystems, and have specific intentions to

continue to do so on an ongoing basis into the future.

32

54.   For example, one of Save the Manatee Club's members has loved manatees since childhood. For over 20 years, this member has organized and participated in fundraisers and volunteer opportunities to benefit manatees; she later built her career centered around wildlife conservation, including and especially manatee conservation. She frequently visits Blue Spring State Park and Merritt Island National Wildlife Refuge to view manatees, both of which are a reasonably short drive from her home. She additionally spent her birthday viewing manatees at Crystal River National Wildlife Refuge and plans to visit again for manatee viewing in the near future. Her interest in manatees and their habitat will be irreparably harmed by reductions in critical habitat protections due to the Critical Habitat Exclusion Rule.

55.   Plaintiffs bring this lawsuit on behalf of themselves and their adversely affected members, supporters and staff. Plaintiffs and their members have a concrete interest in the Service's lawful implementation of the ESA's critical habitat provisions because of the vital role that critical habitat plays in preventing harm to, and promoting the recovery of, imperiled wildlife. The Critical Habitat Exclusion Rule harms Plaintiffs by undermining the scientifically justified consideration for the designation and protection of critical habitats of extreme biological significance that are essential to ESA-listed species' conservation and recovery. The Critical Habitat Exclusion Rule will preclude the Service from

33

exercising its discretion to make designations, and exclusions, on a case-by-case basis, as necessary to protect imperiled species. The Critical Habitat Exclusion Rule will further preclude the Service from exercising its discretion not to exclude areas from critical habitat designation on the basis of claims of economic harm. Finally, the Critical Habitat Exclusion Rule will remove the presumption favoring critical habitat designation on federal lands, where critical habitat confers its greatest benefits. Each of these impacts of the Critical Habitat Exclusion Rule will harm Plaintiffs' interests.

56. The Service's own economic analysis for the 2020 promulgation of the Critical Habitat Exclusion Rule acknowledges: "[t]he rule is likely to result in additional areas being excluded from future critical habitat designations . . . due to 1) the additional considerations regarding community impacts and nonbiological impacts identified by a permittee, lessee, or contractor applicant for a permit, lease, or contract on Federal lands; 2) the clarification for stakeholders regarding what constitutes 'credible information' that will trigger a 4(b)(2) exclusion analysis; and 3) the provision that [the Service] will weight information in [sic] impacts based on who has the relevant expertise."

57. On February 3, 2025, Defendant Burgum directed Assistant Secretaries to develop an action plan to, among other things, "review and, as appropriate, revise all relevant critical habitat designations promulgated by the

34

U.S. Fish and Wildlife Service to ensure that . . . they take into consideration the economic impact and impact on national security, and in consideration of the Secretary's statutory authority to exclude areas as outlined in section 4(b)(2) of the Endangered Species Act." Given this directive, and given that the Service routinely revises existing critical habitat designations (either *sua sponte* or in response to petitions), the currently designated critical habitat that Plaintiffs have worked so hard to protect is now at substantial risk of being stripped of vital protection. Any reduction in critical habitat that is essential to the conservation of imperiled species harms the species' likelihood of survival and recovery and harms the concrete interests of Plaintiffs members in observing, photographing, studying, and enjoying these species in the wild.

58. In addition to harming and risking harm to the concrete interests of Plaintiffs' members and supporters, the Critical Habitat Exclusion Rule harms the operations and core missions of the Plaintiff organizations themselves. Participating in the process of designating critical habitat is a core business activity of Plaintiffs. The Critical Habitat Exclusion Rule now requires the Service to exclude areas from critical habitat based on information provided by opponents of critical habitat designation, unless the Service has information to affirmatively rebut these speculative claims of harm. At the same time, the Rule prevents Plaintiffs from participating in rebutting these claims, because the Service does not

35

post the majority of public comments on the docket for Plaintiffs to review, and does not provide any procedure for rebuttal comments to be submitted even for the comments it does post publicly. This process harms Plaintiffs' organizations' ability to review information that has been submitted to the Service and to participate effectively in the public process for critical habitat designation. By reducing critical habitat designation and protection for biologically significant areas, the Critical Habitat Exclusion Rule also directly impedes Plaintiffs' core missions to protect imperiled species.

59.     Additionally, Plaintiffs and their members' concrete interests are injured by the Service's failures, before promulgating the Critical Habitat Exclusion Rule, to evaluate the environmental effects of the Critical Habitat Exclusion Rule under NEPA.

60.     The ESA expressly declares that endangered and threatened "species of fish, wildlife, and plants are of esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people." 16 U.S.C. § 1531(a)(3). The harms that would result from the loss of biological diversity are enormous, and the nation cannot fully apprehend their scope because of the "*unknown* uses that endangered species might have and . . . the *unforeseeable* place such creatures may have in the chain of life on this planet." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 178–79 (1978) (emphases in original); *see also id.* at 178 (the

36

value of this genetic heritage is "quite literally, incalculable"). The recreational, scientific, commercial, aesthetic, cultural, and spiritual interests of Plaintiffs and their members in threatened and endangered species and their critical habitat have been, are being, and, unless the relief prayed for is granted, will continue to be directly and adversely affected by Defendants' failure to comply with the law.

## Defendants

61.    Defendant Douglas Burgum is sued in his official capacity as Secretary of the United States Department of the Interior. Secretary Burgum has responsibility for implementing and fulfilling the duties of the United States Department of the Interior, including the administration of the ESA with regard to threatened and endangered terrestrial and freshwater plant and animal species.

62.    Defendant U.S. Fish and Wildlife Service is the agency within the United States Department of the Interior responsible for administering the ESA with regard to threatened and endangered terrestrial and freshwater plant and animal species. The Service promulgated the Critical Habitat Exclusion Rule challenged in this case.

## BACKGROUND

**Designating Critical Habitat is Key to Achieving the ESA's Goal to Recover Endangered and Threatened Species.**

37

63.    When Congress enacted the ESA in 1973, it understood that habitat protection was key to saving species from extinction and allowing for their eventual recovery:

> Man can threaten the existence of species of plants and animals in any of a number of ways . . . . The most significant of those has proven also to be the most difficult to control: the destruction of critical habitat. . . . [T]here are certain areas which are critical which can and should be set aside. It is the intent and purpose of this legislation to see that our ability to do so, at least within this country, is maintained.

H.R. Rep. No. 93-412, at 5 (1973).

64.    Consistent with that understanding, Congress identified as the first of the ESA's purposes "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved." 16 U.S.C. § 1531(b).

65.    ESA Section 4, 16 U.S.C. § 1533, requires the listing of species as endangered or threatened when they meet specified statutory listing criteria. Further evidencing Congress's understanding of habitat's vital role in species conservation, the first listing criterion is "the present or threatened destruction, modification, or curtailment of [the species'] habitat or range." *Id.* § 1533(a)(1)(A).

66.    Once a species is listed, various safeguards apply to prevent activities that will cause harm to members of the species or that will jeopardize the species' survival and recovery. One such key measure is ESA Section 7's prohibition on federal agency actions that are "likely to jeopardize the continued existence of any

38

endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary . . . to be critical." *Id.* § 1536(a)(2).

67.   Critical habitat is defined under the ESA to include both:

(i)   the specific areas within the geographical area occupied by the species, at the time it is listed in accordance with the provisions of section 1533 of this title, on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and

(ii)   specific areas outside the geographical area occupied by the species at the time it is listed in accordance with the provisions of section 1533 of this title, upon a determination by the Secretary that such areas are essential for the conservation of the species.

*Id.* § 1532(5)(A).

68.   "Conservation," as used in this definition, is itself defined broadly to include "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary," that is, when the species has recovered and no longer needs the ESA's protection. *Id.* § 1532(3).

69.   The ESA establishes an interagency consultation process to assist federal agencies in complying with their duty to avoid jeopardy to listed species or destruction or adverse modification of their critical habitat. *See generally id.* § 1536(a)(2); 50 C.F.R. §§ 402.13–402.14. Briefly stated, once an agency enters

39

formal consultation with the Service regarding a proposed course of action, the Service must prepare a biological opinion to evaluate the action's effects. If the Service determines the action is likely to "jeopardize the continued existence of a listed species" or destroy or adversely modify its critical habitat, the Service must issue a "jeopardy biological opinion," that includes "reasonable and prudent alternatives," if any, that can avoid the harm. 50 C.F.R. § 402.14(h)(1)(iv)–(2).

70.   If the Service cannot develop a reasonable and prudent alternative that is acceptable to the agency proposing the action and any third-party applicant involved in the action, the jeopardy biological opinion prohibits the action from moving forward.

71.   Critical habitat designation provides additional benefits to listed species beyond Section 7's prohibition against actions that jeopardize their continued survival, because critical habitat provides for the "conservation" needs of the species, 16 U.S.C. § 1532(5)(A)(i)–(ii), defined broadly to include recovery goals. *Id.* § 1532(3); *see also Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1070 (9th Cir. 2004). Critical habitat designation is, therefore, designed to provide the additional benefit of assisting in the recovery of listed species—for instance, by protecting currently unoccupied habitat that a species must be able to occupy to recover, *see* 16 U.S.C. § 1532(5)(A)(ii)—as well

as to alert the public and agency decisionmakers to the importance of these designated areas for conservation activities.

72.     In 1976, Congress reiterated the distinct importance of critical habitat and the prohibition on adverse modification:

> It is the Committee's view that classifying a species as endangered or threatened is only the first step in insuring its survival. Of equal or more importance is the determination of the habitat necessary for that species' continued existence. Once a habitat is so designated, the Act requires that proposed Federal actions not adversely affect the habitat. If the protection of endangered and threatened species depends in large measure on the preservation of the species' habitat, then *the ultimate effectiveness of the Endangered Species Act will depend on the designation of critical habitats*.

H.R. Rep. No. 94-887, at 3 (1976) (emphasis added).

73.     For the ESA's first five years, the Service was authorized, but not obliged, to designate critical habitat. Congress amended the ESA in 1978 to require that, when a species is listed as endangered or threatened, the Service generally must "concurrently . . . designate any habitat of such species which is then considered to be critical habitat." 16 U.S.C. § 1533(a)(3)(A)(i).

74.     In making critical habitat designation mandatory, Congress reaffirmed that "[t]he loss of habitat for many species is universally cited as the major cause for the extinction of species worldwide." H.R. Rep. No. 95-1625, at 5 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 9453, 9455.

75.     ESA Section 4(b)(2) reads in full:

> The Secretary shall designate critical habitat, and make revisions thereto, under subsection (a)(3) *on the basis of the best scientific data available* and after taking into consideration the economic impact, the impact on national security, and any other relevant impact, of *specifying any particular area as critical habitat*. The Secretary *may exclude any area from critical habitat* if he determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat, unless he determines, based on the best scientific and commercial data available, that the failure to designate such area as critical habitat will result in the extinction of the species concerned.

16 U.S.C. § 1533(b)(2) (emphasis added).

76.     In 1980, the Service and National Marine Fisheries Service ("NMFS") (together "the Services"), which implements the ESA for many marine species, promulgated joint regulations to implement the ESA's critical habitat provisions, including ESA Section 4(b)(2)'s mandatory impacts analysis and discretionary exclusion analysis. *See* 50 C.F.R. § 424.12 (1980); Rules for Listing Endangered and Threatened Species, Designating Critical Habitat, and Maintaining the Lists, 45 Fed. Reg. 13010 (Feb. 27, 1980).

77.     The 1980 regulation stated in relevant part that, in designating critical habitat, the Services "shall consider the reasonably probable economic and other impacts of the designation upon such activities." 50 C.F.R. § 424.12(c) (1980); 45 Fed. Reg. at 13023. Tracking the statutory language, the regulation also provided that the Services "*may* exclude any such area from the Critical Habitat if [the Service or NMFS] determines that the benefits of such exclusion outweigh the

42

benefits of specifying the area as part of the Critical Habitat." 50 C.F.R.

§ 424.12(c) (1980) (emphasis added); *see also* 45 Fed. Reg. at 13023.

78.     In 1984, the Services amended the critical habitat regulations, moving

the nonbiological impacts and discretionary exclusion analyses to a subsection that

was separate from the one governing the identification, based on the best scientific

data available, of areas that qualify as critical habitat. *See* 50 C.F.R. § 424.19

(1984); Listing Endangered and Threatened Species and Designating Critical

Habitat; Amended Procedures to Comply with the 1982 Amendments to the

Endangered Species Act, 49 Fed. Reg. 38900 (Oct. 1, 1984). Their stated rationale

for this amendment was to "keep separate the biological and economic

considerations" of designating critical habitat. 49 Fed. Reg. at 38907. The language

implementing ESA Section 4(b)(2) was not changed in any material way.

79.     In 2013, the Services amended the joint ESA regulations governing

critical habitat designation to provide that the Services would publish a draft

economic analysis concurrently with publication of a proposed critical habitat

designation. *See* 50 C.F.R. § 424.19(a) (2013); Endangered and Threatened

Wildlife and Plants; Revisions to the Regulations for Impact Analyses of Critical

Habitat, 78 Fed. Reg. 53058 (Aug. 28, 2013). This amendment changed the timing

of making this document available to the public (at the beginning rather than the

end of the critical habitat designation process) to facilitate public comment on the

43

Services' analysis of the economic impacts of designation. *See* 78 Fed. Reg. at 53058. In publishing the 2013 amendments, the Services noted that "a draft economic analysis of a critical habitat designation is only one of many pieces of information the Secretaries use in determining whether to exclude areas under section 4(b)(2) of the Act, *if the Secretary decides to engage in that discretionary analysis*." *Id.* at 53061 (emphasis added).

80.    The 2013 amendments made clear the broad sweep of the Services' discretion to "consider impacts at a scale that the [agency] determines to be appropriate," 50 C.F.R. § 424.19(b), and to "assign the weight given to any benefits relevant to the designation of critical habitat." *Id.* § 424.19(c). These additional revisions served to "codify the current practices of the agencies." 78 Fed. Reg. at 53058.

81.    In 2016, the Services published a policy to further explain how the Services conduct their discretionary exclusion analyses for critical habitat designations (the "2016 Policy"). *See* Policy Regarding Implementation of Section 4(b)(2) of the Endangered Species Act, 81 Fed. Reg. 7226 (Feb. 11, 2016). The Services explained in the 2016 Policy that, after (1) implementing "the biologically driven first step of identifying 'critical habitat' for a species" and (2) engaging in the mandatory impacts analysis, the Act "provides a mechanism that allows the Secretaries to exclude particular areas only upon a determination that the benefits

44

of exclusion outweigh those of inclusion, so long as the exclusion will not result in the extinction of the species concerned." *Id.* at 7228.

82.     The 2016 Policy emphasized that "[n]either the Act nor the implementing regulations at 50 CFR 424.19 require the [Services] to conduct a discretionary 4(b)(2) exclusion analysis," and that the Services have "discretion as to what factors to consider as benefits of inclusion and benefits of exclusion, and what weight to assign to each factor—nothing in the Act, its implementing regulations, or this policy limits this discretion." *Id.*

83.     After setting forth these basic principles, the 2016 Policy provided that the Services will prioritize designation of critical habitat on federal lands, and "focus our exclusions on non-Federal lands." *Id.* at 7232. This policy recognized the high conservation value of designating critical habitat on federal lands because of the affirmative duty ESA Section 7 places on federal agencies to "utilize their authorities in furtherance of the purposes" of the Act and to "insure" that any actions authorized, funded, or carried out by a federal agency do not destroy or adversely modify critical habitat. 16 U.S.C. § 1536(a)(1)–(2); *see* 81 Fed. Reg. at 7231.

**The 2020 Section 4(b)(2) Rule and Its 2022 Rescission**

84.     Beginning in December 2020, the Service initiated a sharp departure from these administrative precedents. During that month, the Service promulgated

45

a short-lived version of the Critical Habitat Exclusion Rule that reversed the Agency's long-standing interpretation of Section 4(b)(2). The December 2020 rule was nearly identical, other than a small handful of typographical differences, to the 2026 Critical Habitat Exclusion Rule challenged in this case. Just like the 2026 Critical Habitat Exclusion Rule, the 2020 Rule (1) required the Service to consider excluding an area from critical habitat if a party provides "credible information" regarding a relevant impact, which the Service defined as "a reasonably reliable indication regarding the existence of a meaningful economic or other relevant impact"; (2) required the Service to "give weight" to the information provided by the party proposing exclusion, unless the Service could affirmatively rebut the information provided; (3) required the Service to exclude the proposed area from critical habitat designation if the benefits of excluding a particular area from critical habitat outweighed the benefits of specifying that area as part of the critical habitat; and (4) made it easier to prevent designation of critical habitat located on federal lands. Endangered and Threatened Wildlife and Plants; Regulations for Designating Critical Habitat, 85 Fed. Reg. 82376 (Dec. 18, 2020). The Service claimed at the time it promulgated the December 2020 rule that the rule revision was needed to "provide greater transparency and certainty for the public and stakeholders." *Id.* at 82386.

46

85.    In response, A coalition that included plaintiffs in this case challenged the 2020 rule in *Center for Biological Diversity v. Bernhardt*, No. 1:21-cv-00041 (D. Haw.), alleging that the rule was contrary to the text and purpose of the ESA, illegally delegated the Service's statutory duties to critical habitat opponents, arbitrarily and capriciously reversed longstanding agency policy, and failed to comply with the National Environmental Policy Act and ESA Section 7 consultation requirements.

86.    Then, in 2022, while that litigation was pending, the Service rescinded the December 2020 rule. Endangered and Threatened Wildlife and Plants; Regulations for Designating Critical Habitat, 87 Fed. Reg. 43433 (July 21, 2022). In its rescission of the 2020 rule, the Service admitted that the 2020 Critical Habitat Exclusion Rule "is problematic for three overarching reasons: it limits or undermines the Service's role as the expert agency; it constrains the Service's discretion, thus decreasing the agency's ability to further the conservation of endangered and threatened species through designation of their critical habitats; and it does not further the goal of providing clarity and transparency and instead creates confusion." *Id.* at 43434–35.

**The 2026 Section 4(b)(2) Rule and Plaintiffs' Comments**

87.    On November 21, 2025, the Service re-proposed its rescinded Critical Habitat Exclusion Rule. Endangered and Threatened Wildlife and Plants;

47

Regulations for Designating Critical Habitat, 90 Fed. Reg. 52592 (Nov. 21, 2025).

In doing so, the Service did not acknowledge that it had found essentially this same rule "problematic" for multiple reasons, only three years earlier. Instead, repeating the rationale offered for its flawed December 2020 rulemaking, the Service again claimed that the rule revision was needed "to provide greater transparency and certainty for the public and stakeholders." *Id.* at 52592. It also stated that it was proposing the Critical Habitat Exclusion Rule in response to Executive Order 14154, entitled "Unleashing American Energy," which "directed all departments and agencies to immediately review agency actions that potentially impose an undue burden on the identification, development, or use of domestic energy resources." *Id.* at 52593.

88.    During the public comment process for this proposed rulemaking, Plaintiffs submitted extensive comments again detailing how the rule violates the ESA's mandate to prioritize the protection and recovery of imperiled species.

89.    First, the Critical Habitat Exclusion Rule requires that the Service conduct an exclusion analysis whenever a "proponent of excluding a particular area (including but not limited to permittees, lessees or others with a permit, lease, or contract on federally managed lands) has presented credible information regarding the existence of a meaningful economic or other relevant impact supporting a benefit of exclusion for that particular area." 50 C.F.R.

§ 17.90(c)(2)(i). This requirement eliminates the Service's statutory discretion whether to conduct an exclusion analysis in the first place.

90. The new regulation does not define "credible information." However, the Federal Register notice states that the term "refers to information that constitutes a reasonably reliable indication regarding the existence of a meaningful economic or other relevant impact supporting a benefit of exclusion for a particular area." 91 Fed. Reg. at 45670. This vague standard sets an unreasonably low bar, meaning that virtually any alleged impact may trigger the Service's new duty to conduct an exclusion analysis that the ESA itself makes entirely discretionary.

91. Oil and gas exploration, logging, mining, and ranching interests are examples of entities that hold federal permits, leases or contracts for the extraction and use of natural resources located on federal lands, and that regularly advocate that the Service exclude vast swaths of critical habitat from final designations because of alleged economic impacts. Other proponents of critical habitat exclusions may include State agencies, municipalities, and private landowners. The new rule establishes an extremely low and malleable standard by which such entities may force the Service into a nondiscretionary exclusion analysis.

92. Second, the Critical Habitat Exclusion Rule states that, for a non-exclusive list of subject areas "outside the scope of the Service's expertise," the agency must weigh the benefits of inclusion or exclusion "consistent with the

49

expert or firsthand information" received from those commenting on a proposed designation "unless [the Service] has knowledge or material evidence that rebuts that information." 50 C.F.R. § 17.90(d)(1).

93.     The Critical Habitat Exclusion Rule then broadly defines most nonbiological impacts as lying "outside the scope" of the Service's expertise, including, but not limited to, any and all "[n]onbiological impacts identified by a permittee, lessee, or contractor applicant for a permit, lease, or contract on Federal lands." *Id.* § 17.90(d)(1)(iv).

94.     Thus, under these provisions, after an opponent of designation has triggered the exclusion analysis by identifying a benefit of exclusion, the Service must "give weight to those benefits consistent with [that] information," unless the Service musters "material evidence that rebuts that information." *Id.* § 17.90(d)(1). In the past, consistent with the plain language of ESA Section 4(b)(2), the Service has dismissed speculative or otherwise unsupported claims of exorbitant economic costs made by critical habitat opponents. Now, under the Critical Habitat Exclusion Rule, these same claims are presumptively valid and the Service must "give weight" to them unless the Service can affirmatively rebut them.

95.     Third, the Critical Habitat Exclusion Rule categorically requires that the Service exclude areas from critical habitat whenever the benefits of exclusion outweigh the benefits of inclusion. *Id.* § 17.90(e).

50

96.     The Critical Habitat Exclusion Rule thus establishes a rebuttable presumption in favor of stripping critical habitat protection from areas that the best available science has identified as essential for a listed species' conservation, including habitat that is located on federal lands, whenever those areas have been targeted for development, extraction and exploitation. This approach flips on its head Congress's policy of "institutionalized caution" in the ESA. *Tenn. Valley Auth.*, 437 U.S. at 194; *Ariz. Cattle Growers' Ass'n v. Salazar*, 606 F.3d 1160, 1166–67 (9th Cir. 2010). Instead of affording "the highest of priorities" to the endangered and threatened species whose conservation depends on critical habitat and for whose benefit Congress enacted the ESA, *Tenn. Valley Auth.*, 437 U.S. at 194, the new rule gives highest priority to the interests of those seeking to destroy or adversely modify habitat that is essential to the survival and recovery of such species.

97.     Finally, the Critical Habitat Exclusion Rule reverses the 2016 policy position that the Service generally does not exclude Federal lands from critical habitat designations. The 2016 Policy recognized the high conservation value of designating critical habitat on federal lands because of the affirmative duty ESA Section 7 places on federal agencies to "utilize their authorities in furtherance of the purposes" of the Act and to "insure" that any actions authorized, funded, or carried out by a federal agency do not destroy or adversely modify critical habitat.

51

16 U.S.C. § 1536(a)(1), (2). The Critical Habitat Exclusion Rule abandons this longstanding approach without explaining why these conclusions are no longer valid.

98.     The Service issued the final Critical Habitat Exclusion Rule on July 21, 2026, without providing a valid justification for these radical changes in how the agency performs its discretionary exclusion analysis, again stating merely its intent "to provide greater transparency and certainty for the public and stakeholders," 91 Fed. Reg. at 45662, and calling the rule a "preferable policy choice," while also confirming that the impetus for the rule was the presidential directive to "Unleash[] American Energy." 91 Fed. Reg. at 45677, 45663.

99.     The Service's stated rationale is both logically unsound and contrary to congressional intent in mandating critical habitat designation in the ESA. Since the Services first promulgated their joint regulations in 1980, the Service has provided transparency to the public by publishing a critical habitat proposal, soliciting public comment on the impacts of the designation, and responding to comments—including requests for exclusion—in the Federal Register notice for the final critical habitat designation. Further, the Service has long made its economic analysis, which addresses the most controversial impacts of a proposed designation, available for public review. The Service more recently made that analysis available at the time of publishing a critical habitat proposal to allow

52

direct public comment on the agency's analysis and rebuttal to the analysis. Thus, the Service's prior procedures ensured transparency of agency activities concerning critical habitat designation. Placing the burden on the Service to affirmatively rebut dubious claims of harm does not increase transparency beyond the prior notice and comment procedures established by the joint regulations. It does, however, stack the deck against critical habitat designation, harming the imperiled species the ESA was enacted to protect.

100.   The Service's "certainty" rationale for the Critical Habitat Exclusion Rule is also flawed. Providing "certainty" that logging, mining, ranching and other interests will be able to develop, exploit, and destroy habitat that the best available science identifies as essential for species conservation is not a legally permissible rationale for rulemaking under the ESA.

101.   When it enacted the ESA, Congress made a specific finding that "various species of fish, wildlife, and plants in the United States have been rendered extinct as a consequence of economic growth and development untempered by adequate concern and conservation." 16 U.S.C. § 1531(a). To counteract this alarming trend, Congress required that critical habitat decisions be based on "the best scientific data available," *Id.* § 1533(b)(2). Congress imposed this requirement to "give the benefit of the doubt to the species," H.R. Rep. No. 96-697, at 12 (1979) (Conf. Rep.), *as reprinted in* 1979 U.S.C.C.A.N. 2572, 2576,

53

and "to halt and reverse the trend toward species extinction, ***whatever the cost***."

*Tenn. Valley Auth.*, 437 U.S. at 184 (emphasis added). Prioritizing the concerns of development interests over the protection of imperiled species is directly contrary to the goals and purposes of the Act.

102.   The Service also failed to engage in a NEPA analysis of environmental effects before promulgating the Critical Habitat Exclusion Rule. Instead, the Service relied upon a categorical exclusion under 43 C.F.R. § 46.210(i) for "[p]olicies, directives, regulations, and guidelines: that are of an administrative, financial, legal, technical, or procedural nature,'' 91 Fed. Reg. at 45681, despite the fact that the Critical Habitat Exclusion Rule is substantive, not "administrative" or "procedural." Moreover, even if that categorical exclusion applied (which it does not), several extraordinary circumstances that exempt an agency action from categorical exclusions apply here because the rule is likely to have significant adverse environmental effects and to harm threatened and endangered species and their designated critical habitat. The Service unlawfully failed to analyze this or any other likely, harmful effects of the Critical Habitat Exclusion Rule under NEPA before promulgating the final rule.

**FIRST CLAIM FOR RELIEF**

(VIOLATION OF THE NATIONAL ENVIRONMENTAL
PROTECTION ACT AND ADMINISTRATIVE PROCEDURE ACT:
UNLAWFUL RELIANCE ON A CATEGORICAL EXCLUSION TO AVOID
NEPA REVIEW)

103. Plaintiffs reallege and incorporate by this reference each and every allegation set forth in this Complaint.

104. The National Environmental Policy Act establishes "a broad national commitment to protecting and promoting environmental quality." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989). NEPA "ensures that the agency and the public are aware of the environmental consequences of proposed projects" and "helps agencies to make better decisions." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 177 (2025). To meet those goals, NEPA requires that agencies "consider every significant aspect of the environmental impact of a proposed action" and inform the public of the environmental impacts of agency proposals. *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 97 (1983) (quoting *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*, 435 U.S. 519, 553 (1978)).

105. Prior to undertaking any "major Federal action[] significantly affecting the quality of the human environment," NEPA requires federal agencies to develop an environmental impact statement ("EIS"), which is a "detailed statement" that includes analysis of the "reasonably foreseeable environmental effects of" and "a reasonable range of alternatives to" the proposed action. 42 U.S.C. § 4332(C)(i), (iii). In conducting a NEPA analysis an agency must ensure

55

the "scientific integrity" of its analysis and make use of "reliable data and resources." *Id.* § 4332(D)–(E).

106.   Where the proposed federal action "has a reasonably foreseeable significant effect on the quality of the human environment," the agency must prepare an EIS. *Id.* § 4336(b)(1). Where the proposed action does not have a reasonably foreseeable significant effect, or its significance is unknown, the agency may prepare an environmental assessment ("EA") to determine whether the effect of the action is significant and thus requires an EIS, or is not significant, in which case the agency issues a finding of no significant impact ("FONSI"). *Id.* § 4336(b)(2). An agency need not prepare an EIS or EA if the proposed action falls within a "categorical exclusion," which is a category of actions that the agency has determined "normally does not significantly affect the quality of the human environment." *Id.* at §§ 4336e(1), 4336(b)(2).

107.   The Department of Interior has adopted a categorical exclusion to NEPA review for "[p]olicies, directives, regulations, and guidelines: that are of an administrative, financial, legal, technical, or procedural nature; or whose environmental effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis and will later be subject to the NEPA process, either collectively or case-by-case," except in situations where any of the extraordinary circumstances in 43 C.F.R. § 46.215 apply. 43 C.F.R. § 46.210(i). Section 46.215,

56

in turn, lists extraordinary circumstances to include, in part, where the Service actions "may":

> (b) Have significant impacts on such natural resources and unique geographic characteristics as historic or cultural resources; park, recreation or refuge lands; wilderness areas; wild or scenic rivers; national natural landmarks; sole or principal drinking water aquifers; prime farmlands; wetlands; floodplains; national monuments; migratory birds; and other ecologically significant or critical areas.

> (c) Have highly uncertain and potentially significant environmental effects or involve unique or unknown environmental risks.

> (d) Establish a precedent for future action or represent a decision in principle about future actions with potentially significant environmental effects.

> (e) Have a direct relationship to other actions that implicate potentially significant environmental effects. . . . [and]

> (g) Have significant impacts on species listed, or proposed to be listed, on the List of Endangered or Threatened Species or have significant impacts on designated Critical Habitat for these species.

108.   Here, the Service concluded that the Critical Habitat Exclusion Rule was categorically excluded from NEPA as one of the agency's "[p]olicies, directives, regulations, and guidelines: that are of an administrative, financial, legal, technical, or procedural nature." 91 Fed. Reg. at 45679, 45681. To the contrary, the Critical Habitat Exclusion Rule removes vital protections from threatened and endangered species by changing the conditions for designating critical habitat, making it harder for the Service to protect habitat areas that the best available science indicates are essential to listed species' survival and recovery.

57

The revisions are thus likely to have significant adverse environmental effects and are likely to harm threatened and endangered species and their designated critical habitat. Accordingly, the Critical Habitat Exclusion Rule is far from administrative or technical.

109. Even if the Critical Habitat Exclusion Rule could be covered by a categorical exclusion, extraordinary circumstances require the preparation of an EIS or, at minimum, an EA for the rule. The Critical Habitat Exclusion Rule has highly controversial environmental effects, involves unresolved conflicts concerning alternative uses of available resources, has highly uncertain and potentially significant environmental effects, involves unique or unknown environmental risks, establishes a precedent for future action and represents a decision in principle about future actions with potentially significant environmental effects, and has significant impacts on listed species, species proposed to be listed, and designated critical habitat under the ESA. *See* 43 C.F.R. § 46.215(b)–(e), (g). Because the Critical Habitat Exclusion Rule significantly and adversely affects imperiled species and the ecosystems on which they depend, the Service could not lawfully apply a categorical exclusion to avoid the need to prepare an EIS (or, at a minimum, an EA).

110. The Service's invocation of a categorical exclusion to avoid its duty to prepare a legally adequate NEPA analysis for the Critical Habitat Exclusion Rule

58

is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, in violation of NEPA, the Service's regulations implementing NEPA, and the APA, 5 U.S.C. § 706(2).

## **PRAYER FOR RELIEF**

Therefore, Plaintiffs respectfully request that the Court:

1. Declare that the Service acted arbitrarily, capriciously, and contrary to law, including NEPA, in violation of the APA, by invoking a categorical exclusion and failing to prepare an EIS or EA for the Critical Habitat Exclusion Rule;

2. Hold unlawful and vacate the Critical Habitat Exclusion Rule;

3. Restore the regulations and policies governing ESA Section 4(b)(2) critical habitat exclusions that were in effect immediately prior to the promulgation of the Critical Habitat Exclusion Rule;

4. Enjoin the Service from applying or otherwise relying upon the Critical Habitat Exclusion Rule;

5. Award Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees; and

6. Grant Plaintiffs such further and additional relief as the Court may deem just and proper.

DATED:   Honolulu, Hawai'i, July 30, 2026.

Respectfully submitted,

/s/ Harley M. Broyles                              /s/ Ryan Adair Shannon
HARLEY M. BROYLES (#011640)      RYAN ADAIR SHANNON

59

EARTHJUSTICE
850 Richards Street, Suite 400
Honolulu, Hawaiʻi 96813
Tel: (808) 599-2436
Email: hbroyles@earthjustice.org

/s/ Elizabeth B. Forsyth
ELIZABETH B. FORSYTH
(*pro hac vice* pending)
KRISTEN L. BOYLES
(*pro hac vice* pending)
EARTHJUSTICE
810 3rd Ave #610
Seattle, WA 98104
Tel: (206) 343-7340
Email: eforsyth@earthjustice.org
       kboyles@earthjustice.org

/s/ Barclay T. Samford
BARCLAY T. SAMFORD
(*pro hac vice* pending)
EARTHJUSTICE
633 17th Street, Suite 1600
Denver, CO 80202
Tel: (303) 623-9466
Email: csamford@earthjustice.org

*Attorneys for Plaintiffs Conservation Council for Hawaiʻi, National Parks Conservation Association, Sierra Club, WildEarth Guardians, and Save the Manatee Club*

(*pro hac vice* pending)
Defenders of Wildlife
2009 NE Alberta, Ste. 207
Portland, OR 97211
Tel: (503) 899-0663
Email: rshannon@defenders.org

/s/ Joseph M. Manning
JOSEPH M. MANNING
(*pro hac vice* pending)
Defenders of Wildlife
1130 17th St. NW
Washington, DC 20036
Tel: (202) 579-5097
Email: jmanning@defenders.org

*Attorneys for Plaintiff Defenders of Wildlife*

/s/ Brian P. Segee
BRIAN P. SEGEE
(*pro hac vice* pending)
Center for Biological Diversity
226 W. Ojai Ave., Suite 101-442
Ojai, CA 93023-3278
Tel: (805) 750-8852
Email: bsegee@biologicaldiversity.org

/s/Maxx Phillips
MAXX PHILLIPS (#10032)
Center for Biological Diversity
1188 Bishop Street, Suite 2001
Honolulu, Hawaiʻi 96813
Tel: (808) 284-0007
mphillips@biologicaldiversity.org

*Attorneys for Plaintiff Center for Biological Diversity*